IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

EDDIE JAMES RICHARDS, JR.,       )
AIS #233735,                     )
                                 )
        Plaintiff,               )
                                 )
   v.                            )        CASE NO. 2:16-CV-707-ALB
                                 )
KENDARIUS GLOVER, et al.,        )
                                 )
        Defendants.              )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION

This 42 U.S.C. § 1983 action is pending before the court on an amended complaint

filed by Eddie James Richards, Jr., an indigent state inmate, challenging actions which

occurred during his incarceration at the Bullock Correctional Facility.  Richards names as

defendants Officer Kendarius Glover, Officer Clarence Giles, and Nurse Martha Jackson.

Richards complains that Glover and Giles acted with deliberate indifference to his safety

when they failed to protect him from attack by other inmates on December 9, 2014. Doc.

12 at 2–3.  He also alleges that nurse Jackson acted with deliberate indifference to his

medical needs after this attack. Doc. 1 at 3.  Richards seeks a declaratory judgment,

injunctive relief, and monetary damages for the alleged violations of his constitutional

rights. Doc. 1 at 4.

The defendants filed special reports and relevant evidentiary materials in support of

their reports—including affidavits, a prison report, and medical records—addressing

Richards' claims.  In these filings, the defendants deny they acted with deliberate

indifference to Richards' safety or medical needs and also assert they did not violate any of his constitutional rights.

The court issued orders directing Richards to file responses to the arguments set forth by the defendants in their special reports and advising him that his responses should be supported by affidavits or statements made under penalty of perjury and other appropriate evidentiary materials. Docs. 35 at 2 & 38 at 3. These orders specifically cautioned the parties that "unless within fifteen (15) days from the date of this order a party files a response in opposition which presents sufficient legal cause why such action should not be undertaken . . . the court may at any time [after expiration of the time for the plaintiff filing a response to the order] and without further notice to the parties (1) treat the special report[s] . . . and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion[s] for summary judgment in accordance with the law." Docs. 35 at 3 & 38 at 3–4. Richards filed sworn responses to these orders. Docs. 48 & 49.

Pursuant to the directives of these orders, the court deems it appropriate to treat the special reports filed by the correctional and medical defendants as motions for summary judgment. Upon consideration of the defendants' motions for summary judgment, the evidentiary materials filed in support thereof, the sworn complaint and the plaintiff's responses in opposition, the court concludes that summary judgment is due to be granted in favor of the defendants.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law." *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (internal quotation marks omitted); Rule 56(a), Fed. R. Civ. P. (directing that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (holding that the moving party has the initial burden of showing there is no genuine dispute of material fact for trial).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–24; *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011) (holding that the moving party discharges its burden by showing the record lacks evidence to support the nonmoving party's case or the nonmoving party would be unable to prove his case at trial).

When the defendants meet their evidentiary burden, as they have in this case, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d

604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3); *Jeffery*, 64 F.3d at 593–94 (holding that, once a moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or statements made under penalty of perjury], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact). In civil actions filed by inmates, federal courts "must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted). This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014).

A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable factfinder to return a verdict in its favor such that summary judgment is not warranted. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). "[T]here must exist a conflict in substantial evidence to pose a jury question." *Hall v. Sunjoy Indus. Group, Inc.*, 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citation omitted). "When opposing parties tell two

different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although factual inferences must be viewed in a light most favorable to the plaintiff and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *See Beard*, 548 U.S. at 525; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, Richards' *pro se* status alone does not compel this court to disregard elementary principles of production and proof in a civil case.

The court has undertaken a thorough and exhaustive review of all the evidence contained in the record. After this review, the court finds that Richards has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the defendants.

## III. DISCUSSION

### A.    Absolute Immunity

To the extent Richards requests monetary damages from the correctional defendants in their official capacities, they are entitled to absolute immunity. Official capacity lawsuits against state employees are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). As the Eleventh Circuit has held,

> the Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies [or employees]. There are two exceptions to this prohibition: where the state has waived its immunity or where Congress has abrogated that immunity. A State's consent to suit

> must be unequivocally expressed in the text of [a] relevant statute. Waiver may not be implied. Likewise, Congress' intent to abrogate the States' immunity from suit must be obvious from a clear legislative statement.

*Selensky v. Alabama*, 619 F. App'x 846, 848–49 (11th Cir. 2015) (internal quotation marks and citations omitted). Thus, a state official may not be sued in his or her official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the State's immunity. *See Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996).

> Neither waiver nor abrogation applies here. The Alabama Constitution states that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. Art. I, § 14. The Supreme Court has recognized that this prohibits Alabama from waiving its immunity from suit.

*Selensky*, 619 F. App'x at 849 (citing *Alabama v. Pugh*, 438 U.S. 781, 782 (1978)). "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (citing *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1525 (11th Cir. 1990)). In light of the foregoing, defendants Glover and Giles are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Selensky*, 619 F. App'x at 849; *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials sued in their official capacities are protected under the Eleventh Amendment from suit for damages); *Edwards v. Wallace Comm. College*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from a state official sued in his official capacity).

## B.    Deliberate Indifference to Safety—Failure to Protect from Attack

"A prison official's duty under the Eighth Amendment is to ensure reasonable

safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer v. Brennan*, 511 U.S. 825, 844–45 (1994) (internal quotations and citations omitted).   Officials responsible for prison inmates may be held liable under the Eighth Amendment for acting with "deliberate indifference" to an inmate's safety when the official knows the inmate faces "a substantial risk of serious harm" and with this knowledge disregards the risk by failing to take reasonable measures to abate it. *Id*. at 828.  A constitutional violation occurs only "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." *Cottone v. Jean*, 326 F.3d 1352, 1358 (11th Cir. 2003).  "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 at 834.  "Within [a prison's] volatile 'community,' prison administrators are to take all necessary steps to ensure the safety of . . . the prison staff and administrative personnel. . . . They are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves." *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984).  The Eleventh Circuit has, however, consistently "stress[ed] that a 'prison custodian is not the guarantor of a prisoner's safety." *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313 (11th Cir. 2005) (citing *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990)).  "Only '[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment.'" *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (citing *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1028 (11th Cir. 2001), *abrogated on other grounds*

by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  "In order to state a § 1983 cause of action against prison officials based on a constitutional deprivation resulting from cruel and unusual punishment, there must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus raising the tort to a constitutional stature." *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982).

The law requires proof of both objective and subjective elements to demonstrate an Eighth Amendment violation. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014).  With respect to the requisite objective elements of a deliberate indifference claim, an inmate must first show "an objectively substantial risk of serious harm . . . exist[ed].  Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner." *Marsh*, 268 F.3d at 1028–29.  As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.' . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 837–38; *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same).  The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is obduracy and wantonness, not inadvertence or error

in good faith, that characterize the conduct prohibited by the Cruel and Unusual

Punishments Clause[.]" *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

> To be deliberately indifferent, Defendants must have been subjectively aware of the substantial risk of serious harm in order to have had a sufficiently culpable state of mind. . . . Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists—and the prison official must also draw that inference.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (citations and internal quotation

marks omitted).   A defendant's subjective knowledge of the risk must be specific to that

defendant because "imputed or collective knowledge cannot serve as the basis for a claim

of deliberate indifference. . . . Each individual Defendant must be judged separately and on

the basis of what that person knew at the time of the incident." *Burnette v. Taylor*, 533 F.3d

1325, 1331 (11th Cir. 2008).   "The known risk of injury must be a strong likelihood, rather

than a mere possibility before a [state official's] failure to act can constitute deliberate

indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and

internal quotation marks omitted).   Moreover, "[m]erely negligent failure to protect an

inmate from attack does not justify liability under section 1983." *Id.*

"Prison correctional officers may be held directly liable under § 1983 if they fail or

refuse to intervene when a constitutional violation occurs in their presence. . . . However,

in order for liability to attach, the officer must have been in a position to intervene." *Terry

v. Bailey*, 376 F. App'x 894, 896 (11th Cir.2010) (citing *Ensley v. Soper*, 142 F.3d 1402,

1407 (11th Cir. 1998)).   The plaintiff has the burden of showing that the defendant was in

a position to intervene but failed to do so. *Ledlow v. Givens*, 500 F. App'x 910, 914 (11th

Cir. 2012) (citing *Hadley v. Gutierrez*, 526 F.3d 1324, 1330–31 (11th Cir. 2008)).

Consequently, to survive the properly supported motion for summary judgment filed by the correctional defendants, Richards must first demonstrate an objectively substantial risk of serious harm existed to him prior to the altercation with the other inmates and "that the defendant[s] disregarded that known risk by failing to respond to it in an objectively reasonable manner." *Johnson v. Boyd*, 568 F. App'x 719, 721 (11th Cir. 2014) (citing *Caldwell*, 748 F.3d at 1100). If he establishes these objective elements, Richards must then satisfy the subjective component. To do so, Richards "must [show] that the defendant[s] subjectively knew that [Richards] faced a substantial risk of serious harm. The defendant[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id.* (internal citation omitted).

> To survive a motion for summary judgment, a plaintiff must submit evidence that the defendant-official had subjective knowledge of the risk of serious harm. In determining subjective knowledge, a court is to inquire whether the defendant-official was aware of a "*particular threat or fear felt by [the] [p]laintiff.*" Moreover, the defendant-official "must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists—and the prison official must also draw that inference."

*Johnston v. Crosby*, 135 F. App'x 375, 377 (11th Cir. 2005) (quoting *Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir. 2003)).

Richards alleges the defendants acted with deliberate indifference to his safety by failing to protect him from attack by a group of G-Dorm inmates on December 9, 2014. In support of this claim, Richards maintains that at the time of this attack the facility had been locked down due to a previous attack by unknown inmates on an unidentified inmate and, therefore, his inmate-attackers should not have been allowed to enter his dorm (Dorm

F-1). Doc. 1 at 3.  The evidence before the court, however, indicates that the attack against Richards was random and unprovoked.  Moreover, Richards does not allege that either defendant Glover or Giles had any knowledge or reason to believe that the inmate-attackers posed a serious risk of harm to him.

The defendants deny they acted with deliberate indifference to Richards' safety. Specifically, Glover, the officer assigned to G-Dorm as a rover, asserts that the first knowledge he had of any issue among Richards and his assailants occurred "[a]t approximately 3:17 a.m. [on December 9, 2014 when he] . . . observed inmate Eddie Richards . . . run to the front of the dormitory (F1) with what appeared to be blood over his face and clothes." Doc. 31-1 at 1.  At this time Glover, "immediately called 'Code Blue' via radio [to summon assistance from other correctional officers]." Doc. 31-1 at 1. Defendant Giles responded to the call for assistance and reported to Dorm-F1. Doc. 31-2 at 1.  Giles placed handcuffs on Richards and escorted him to the health care unit for evaluation and treatment. Doc. 31-2 at 1.

Richards does not allege that he complained to prison officials prior to December 9, 2014 that he was in danger of being attacked by his fellow G-Dorm inmates.  The record likewise is devoid of evidence that Richards provided any information to defendants Glover and Giles of a threat made to him by the inmate-attackers from which the defendants could have inferred that a substantial risk of harm existed to Richards prior to the attack. In sum, there is no evidence before the court that the defendants had knowledge of any impending risk of harm posed to Richards by the inmates who attacked him.  Instead, the record establishes that the altercation occurred without notice or provocation.  No

correctional officer observed the fight and the first knowledge correctional officials received regarding the altercation occurred when Richards appeared at the front of the dorm.

Richards therefore has failed to present any evidence showing his inmate-attackers posed "an objectively substantial serious risk of harm" to him on December 9, 2014, a requisite element for a claim of deliberate indifference. *Marsh*, 268 F.3d at 1028–29. Furthermore, even if Richards had satisfied the objective component, his deliberate indifference to safety claim nevertheless fails because he has not demonstrated that the defendants were subjectively aware of any risk of harm to him posed by these inmates prior to the altercation made the basis of this complaint. *Johnson*, 568 F. App'x at 722 (affirming dismissal of a complaint because "[n]owhere does the complaint allege, nor can it be plausibly inferred, that the defendants subjectively foresaw or knew of a substantial risk of injury posed by [the inmate-attacker]"); *Murphy v. Turpin*, 159 F. App'x 945, 948 (11th Cir. 2005) (concluding that district court correctly dismissed Plaintiff's failure-to-protect claim because "the allegations of [Plaintiff's] complaint do not show the requisite subjective knowledge of a risk of serious harm, and, thus, do not state a claim for deliberate indifference resulting from a failure to protect from the attack. . . . because [Plaintiff] alleged no facts indicating that any officer was aware of a substantial risk of serious harm to him from [the inmate who actually attacked him] and [with this knowledge] failed to take protective measures"); *Johnston*, 135 F. App'x at 377 (holding that defendants were entitled to summary judgment because Plaintiff provided no evidence that prison officials "had subjective knowledge of the risk of serious harm presented by [the inmate who

attacked him]" and "introduced no evidence indicating that he notified [the defendants] of any particularized threat by [his attacker] nor of any [specific] fear [he] felt [from this particular inmate]"); *see also McBride v. Rivers*, 170 F. App'x 648, 655 (11th Cir. 2006) (holding that district court properly granted summary judgment to the defendants as Plaintiff "failed to show that the defendants had subjective knowledge of a risk of serious harm" because Plaintiff merely advised he "had problems" with fellow inmate and was generally "in fear for [his] life"); *Chatham v. Adcock*, 334 F. App'x 281, 293–94 (11th Cir. 2009) (holding that Plaintiff was entitled to no relief on failure to protect claim as he failed to "identify any specific 'serious threat' from [fellow inmate], which he then reported to [the defendants]" and mere "fact that [attacker] was a problem inmate with violent tendencies simply does not satisfy the subjective awareness requirement").

The record in this case contains no evidence—significantly probative or otherwise—showing that the correctional defendants acted with deliberate indifference to Richards' safety. Thus, summary judgment is due to be granted in favor of defendants Glover and Giles on the failure to protect claim.

## C.    Deliberate Indifference to Medical Needs

Richards alleges defendant Jackson acted with deliberate indifference to his medical needs because she "failed to follow medical protocols[,] failed to report the seriousness of [his] injury, [and] failed to send for CAT scan, x-ray or follow-up for temporal injury." Doc. 12 at 3. Despite these allegations, the undisputed medical records refute Richards' deliberate indifference claim arising from the treatment he received for injuries suffered on December 9, 2014.

To prevail on a claim concerning an alleged denial of medical treatment, an inmate must—at a minimum—show that the defendant acted with deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989). Medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (holding, as directed by *Estelle*, that inmate must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment").

Moreover, neither medical malpractice nor negligence equate to deliberate indifference:

> That medical malpractice—negligence by a physician—is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble,* 429 U.S. 97, 105–07, 97 S. Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison [medical care provider's] harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833–38, 114 S. Ct. 1970, 1977–79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams*, 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. DeKalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to establish "deliberate indifference to [a] serious medical need . . . , Plaintiff[] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009). When seeking relief based on deliberate indifference, an inmate is required to show "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (holding that, for liability to attach, the official must know of and then disregard an excessive risk of harm to the prisoner). Regarding the objective component of a deliberate indifference claim, the plaintiff must first show "an objectively serious medical need[] . . . and second, that the response made by [the defendant] to that need was poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligen[ce] in diagnos[is] or treat[ment], or even [m]edical malpractice actionable under state law." *Taylor*, 221 F.3d at 1258 (internal quotation marks and citations omitted). To proceed on a claim challenging the constitutionality of medical care, "[t]he facts alleged must do more than contend medical malpractice, misdiagnosis, accidents, [or] poor exercise of medical judgment." *Daniels v. Williams*, 474 U.S. 327, 330–33 (1986); *Estelle*, 429 U.S. at 106 (holding that neither negligence nor medical malpractice "become[s] a constitutional violation simply because the victim is incarcerated"); *Farmer*, 511 U.S. at 836 (observing that a complaint alleging negligence in diagnosing or treating "a medical condition does not state a valid claim of

medical mistreatment under the Eighth Amendment[,]" nor does it establish the requisite reckless disregard of a substantial risk of harm so as to demonstrate a constitutional violation.); *Kelley v. Hicks*, 400 F.3d 1281, 1285 (11th Cir. 2005) ("Mere negligence . . . is insufficient to establish deliberate indifference."); *Matthews v. Palte*, 282 F. App'x 770, 771 (11th Cir. 2008) (affirming district court's summary dismissal of inmate's complaint because "misdiagnosis and inadequate treatment involve no more than medical negligence").

Additionally, "to show the required subjective intent . . . , a plaintiff must demonstrate that the public official acted with an attitude of deliberate indifference . . . which is in turn defined as requiring two separate things: aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists [] and . . . draw[ing] of the inference[.]" *Taylor*, 221 F.3d at 1258 (internal quotation marks and citations omitted) (alterations in original).  Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and [she] must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.  When

medical personnel attempt to diagnose and treat an inmate, the mere fact that the chosen "treatment was ineffectual . . . does not mean that those responsible for it were deliberately indifferent." *Massey v. Montgomery Cnty. Detention Facility*, 646 F. App'x 777, 780 (11th Cir. 2016).

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 105, 97 S. Ct. at 291; *Mandel* [*v. Doe*, 888 F.2d 783, 787 (11th Cir. 1989)]. Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers*, 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S. Ct. at 292 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Mandel*, 888 F.2d at 787–88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop*, 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). "[A]s *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal quotation marks and citation omitted). Moreover, the law is clear that "[a] difference of opinion as to how a condition should be treated does not give rise to a constitutional violation." *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001); *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that mere fact an inmate

desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution).

Nurse Jackson and Dr. Tahir Siddiq, the medical director at Bullock during the time relevant to the complaint, submitted affidavits, Docs. 37-1 & 37-2, and medical records, Doc. 37-4 at 8–14, 23–35 & 49–60, addressing the deliberate indifference claim presented by Richards.  The details of medical treatment provided to Richards as set forth by Nurse Jackson and Dr. Siddiq in their affidavits are corroborated by the objective medical records contemporaneously compiled during the treatment process.

Nurse Jackson provides the following information in response to the complaint:

> As an LPN, I am not authorized to diagnose medical conditions or prescribe medications during the course of any medical evaluations.  Any decisions related to the diagnoses of specific medical conditions and the treatment of those conditions are made exclusively by the clinicians at Bullock.  Furthermore, I cannot write any type of orders, such as "work stop" orders excusing inmates from work or prescriptions for medications.  Such matters are handled exclusively by the physicians and nurse practitioners at Bullock.
>
> As a member of the Bullock nursing staff, I am generally aware of . . . Eddie J. Richards ("Mr. Richards") who was previously incarcerated at Bullock. . . . I received and reviewed a copy of the . . . Amended Complaint Mr. Richards filed in this action.  It is my understanding that Mr. Richards alleges that, following his altercation with other inmates on December 9, 2014, I was deliberately indifferent to his serious medical needs and "failed to follow medical protocol" by failing to report Mr. Richards's alleged injuries, failing "to send for [a] cat scan [or] x-ray" and failing to provide a follow-up evaluation.  His allegation is completely false and unsubstantiated. I unequivocally deny this allegation.
>
> I reviewed the relevant portions of Mr. Richards's medical records and identified only two occasions when I participated in any way whatsoever in providing nursing care to him.
>
> On December 9, 2014, around 3:20 a.m., members of the Bullock correctional staff escorted Mr. Richards to the health care unit for an assessment by the medical staff.  I saw Mr. Richards at that time, and he told me that "we got jumped on by some dudes."  I checked his vital signs and other physical symptoms.  My examination detected swelling in Mr.

Richards's right hand and lacerations on his face, head and chest.  However, my examination found that Mr. Richards was alert and responsive to my voice and revealed no signs of trauma or indications of distress.  I confirmed that other members of the nursing staff contacted and informed Dr. Tahir Siddiq, the site medical director at Bullock, of Mr. Richards's condition and documented this in my notations in his medical records.

I completed an inmate body chart and nursing encounter tool with regard to Mr. Richards as part of my assessment of him on December 9, 2014.  Completing a body chart and nursing encounter tool is the standard protocol for the Bullock nursing staff for circumstances such as those presented by Mr. Richards.  On the body chart and nursing encounter tool, I noted Mr. Richards's symptoms and the locations of his lacerations and wound.  My assessment did not detect any indications that Mr. Richards was experiencing a medical emergency.

In addition to the body chart and nursing encounter tool, I also completed a segregation record with respect to Mr. Richards on December 9, 2014, noting that the correctional staff was placing Mr. Richards in segregation.  I notified the mental health staff of Mr. Richards's placement in segregation and noted on the segregation record that he did not have a history of suicide attempts and was not on the mental health caseload.

It is my understanding that, following my assessment of Mr. Richards and upon referral, medical providers on the Bullock medical staff, including Dr. Siddiq, examined Mr. Richards on December 9, 2014.  I understand that the medical providers prescribed medications and ordered diagnostic studies relating to Mr. Richards.  As previously indicated, I am not authorized to perform such tasks, nor am I authorized to order follow-up evaluations of patients.

After I completed my assessment of Mr. Richards and the related documentation on December 9, 2014, . . . I did not provide nursing care to him on any other occasion, nor did he request any care from me or submit any medical complaint to me.  If he had requested care from me or if I learned he required medical attention, I would have provided such nursing care as I could render and brought his request to the attention of a provider on the Bullock medical staff.

After December 9, 2014, my only other involvement with Mr. Richards occurred on December 17, 2014, when I completed the necessary documentation for his transfer [from Bullock].  Since his transfer, I have not interacted with him in any way on any occasion whatsoever.

I never refused to provide Mr. Richards with necessary care or ignored any complaints [made] to me related to his medical conditions.  On no occasion was I ever made aware that he required additional medical care or that he was not receiving necessary medical care.

I absolutely deny Mr. Richards's claim that I or any other member of the Bullock medical staff failed to do something related to his medical care.

19

Any such allegation is entirely incorrect and unfounded.  I never refused, and I do not know of anyone who refused, to follow the directives or recommendations of any physician as it relates to the medical care provided to Mr. Richards.  I never interfered, and I am not aware of anyone who interfered, in any way with any medical treatment sought or received by Mr. Richards.  I never deliberately ignored any medical complaints made by Mr. Richards.  I never mistreated Mr. Richards or engaged in any activity or failed to take any necessary actions which resulted in or contributed to any harm or injury allegedly incurred by Mr. Richards.

Doc. 37-1 at 1–4 (paragraph numbering and internal citations to medical records omitted).

Dr. Siddiq addresses the allegation of deliberate indifference, in relevant part, as follows:

At approximately 3:20 a.m. on December 9, 2014, correctional officers escorted Mr. Richards to the health care unit for an examination by the medical staff.  Nurse Jackson assessed Mr. Richards at that time and took his vital signs. Mr. Richards told her that "'we got jumped on by some dudes." Nurse Jackson's examination detected swelling in his right hand, a puncture wound on his head and lacerations on his face and chest.  Nurse Jackson found that Mr. Richards was alert and responsive to her voice. Her examination revealed no signs of trauma or indications of distress.

Nurse Jackson also completed an inmate body chart and nursing encounter tool with regard to Mr. Richards following his altercation. Completing a body chart and nursing encounter tool is the standard protocol for the Bullock nursing staff for circumstances such as those presented by Mr. Richards.  On the body chart and nursing encounter tool, Nurse Jackson noted Mr. Richards's vital signs, the locations of his lacerations and wound and his other symptoms.  The indications suggested that Mr. Richards was not experiencing a medical emergency. Nurse Jackson fully complied with the standard protocol for members of the nursing staff with regard to inmates involved in altercations such as Mr. Richards's and who exhibited a similar physical condition.

Additionally, Nurse Jackson completed a segregation record with respect to Mr. Richards on December 9, 2014, noting that the correctional staff was placing Mr. Richards in segregation.  Nurse Jackson notified the mental health staff of Mr. Richards's placement in segregation and noted on the segregation record that he did not have a history of suicide attempts and was not on the mental health caseload.

At approximately 3:30 a.m. on December 9, 2014, a member of the

nursing staff notified me of Mr. Richards's condition, and I instructed the nursing staff to apply a pressure dressing to his wounds. Nurse Jackson documented my instructions in her notations in Mr. Richards's medical records, and the nursing staff applied a pressure dressing to his wounds.

The Bullock medical staff provided additional care to Mr. Richards on the morning of December 9, 2014, following Nurse Jackson's assessment. After obtaining his informed consent, the Bullock medical staff sutured Mr. Richards's lacerations. A nurse practitioner on the Bullock medical staff also entered a treatment order for Mr. Richards to return to the healthcare unit on a daily basis to receive dressing changes and for the medical staff to cleanse the area around his wound and apply fresh tape to the dressings.

I personally examined Mr. Richards at approximately 8:00 a.m. on December 9, 2014. My examination found the lacerations and wound as noted by Nurse Jackson. I confirmed that the nursing staff properly closed the lacerations with sutures and applied a pressure dressing to stop the bleeding. I directed the nursing staff to continue applying fresh dressings until the bleeding stopped.

That same morning, i.e., the morning of December 9, 2014, Mr. Richards received multiple medication prescriptions. I entered an order prescribing Mr. Richards Tylenol No. 3, a combination of acetaminophen and Codeine, at 300 mg for discomfort. A nurse practitioner on the Bullock medical staff also prescribed 500 mg of cephalexin, an antibiotic, for Mr. Richards to take three (3) times a day for ten (10) days. Additionally, the nurse practitioner prescribed 325 mg of acetaminophen for Mr. Richards to take twice a day for ten (10) days for any discomfort. The nurse practitioner also entered an order for Mr. Richards to receive a tetanus shot following the altercation that morning.

On the morning of December 9, 2014, the nurse practitioner also entered a directive for Mr. Richards to undergo an x-ray of his skull to assess the possibility of a fracture and an x-ray of his right hand.

The following day, December 10, 2014, I prescribed Mr. Richards with one (1) dose of Ibuprofen at 200 mg for any discomfort.

Mr. Richards underwent an x-ray of his right hand and the fingers of his right hand on December 10, 2014. The x-ray indicated a fracture of his pinky finger but no dislocation of the finger. The appropriate treatment indicated for Mr. Richards' broken finger included managing any discomfort with medications and allowing the finger to heal on its own.

The medical staff also took an x-ray of Mr. Richards's skull on December 10, 2014. The x-ray of his skull was normal with no evidence of a fracture.

On December 12, 2014, Mr. Richards submitted a sick call request form expressing concerns about the facial laceration he sustained during the altercation three (3) days earlier. A member of the Bullock nursing

staff (other than Nurse Jackson) saw Mr. Richards for his concerns later that same day. The nurse checked Mr. Richards's vital signs and confirmed they were normal. The nurse examined Mr. Richards's lacerations and found no signs of a complication or infection in the lacerations. The lacerations were not bleeding and appeared to be healing normally. The nurse saw no indications that Mr. Richards was in acute distress, and she instructed him to return to the healthcare unit on an as needed basis.

After being examined on December 12, 2014, Mr. Richards did not submit any other sick call request forms while incarcerated at Bullock.

The ADOC transferred Mr. Richards to Limestone Correctional Facility ("Limestone") on December 17, 2014.

After transferring to Limestone, Mr. Richards submitted a number of sick call request forms in the first several months at that facility, but none of them in any way related to the injuries he sustained during the December 9, 2014, altercation or the medical care he received at Bullock for those injuries. . . .

On December 19, 2014, the Limestone medical staff removed the stitches from Mr. Richards's lacerations. The medical director on the Limestone medical staff examined Mr. Richards's lacerations at that time and found no indications of an infection or an acute development with his lacerations.

A nurse practitioner on the Limestone medical staff followed up and examined Mr. Richards on December 29, 2014. The nurse practitioner's examination confirmed that Mr. Richards's lacerations were dry and exhibited no indications of bruising, swelling or any other signs of an infection. The nurse practitioner concluded that Mr. Richards's lacerations had healed normally. . . .

I am confident that [Mr. Richards] received an appropriate level of treatment [for the injuries he suffered on December 9, 2014]. Furthermore, I cannot see any reason to conclude that the course of treatment Mr. Richards received was inappropriate in any way or that the conduct of the Bullock medical staff fell below the standard of care of that provided by other similarly situated medical professionals. Given this course of treatment, in my professional medical opinion, the Bullock medical staff acted appropriately in all respects. . . . .

There is no evidence or objective data of any kind suggesting that Mr. Richards's condition changed, worsened or declined in any way as a result of the care he received during his incarceration [at Bullock]. . . .

Doc. 37-1 at 2–6 (paragraph numbering and internal citations to medical records omitted).

Under the circumstances of this case, the court finds that the course of treatment undertaken by defendant Jackson did not violate Richards' constitutional rights. Specifically, there is no evidence upon which the court could conclude that defendant Jackson acted in a manner that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris*, 941 F.2d at 1505 (internal quotation marks and citation omitted). Rather, the evidence before the court demonstrates that medical personnel, including Nurse Jackson, evaluated Richards after the December 9, 2014 attack, prescribed medication to him in accordance with their professional judgment, and ordered x-rays to assist in their assessment and treatment of his injuries. Doc. 37-4 at 8–14, 23–35 & 49–60. Whether medical personnel "should have [utilized] additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal quotation marks and citation omitted). Additionally, neither negligence in diagnosis or treatment nor medical malpractice constitute deliberate indifference actionable in a § 1983 case. *Farmer*, 511 U.S. at 836; *Taylor*, 221 F.3d at 1258; *Matthews*, 282 F. App'x at 771. Furthermore, an inmate's desire for some other form of medical treatment than that prescribed does not constitute deliberate indifference violative of the Constitution. *Hamm*, 774 F.2d at 1505; *Franklin*, 662 F.2d at 1344 (holding that simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

Richards' self-serving assertion of deliberate indifference does not create a question of fact in the face of contradictory, contemporaneously created medical records.

*Whitehead*, 403 F. App'x 401, 403 (11th Cir. 2010); *Scott*, 550 U.S. at 380 (observing that where a party's story "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").  Moreover, Richards has failed to present any evidence showing defendant Jackson knew that the manner in which she provided treatment created a substantial risk to his health and with this knowledge consciously disregarded the risk. The record is therefore devoid of evidence showing that defendant Jackson acted with deliberate indifference to Richards' medical needs, and summary judgment is due to be granted in her favor.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.    The defendants' motions for summary judgment be granted.

2.    Judgment be entered in favor of the defendants and against the plaintiff.

3.    This case be dismissed with prejudice.

4.    Costs be taxed against the plaintiff.

On or before **June 12, 2019**, the parties may file objections to the Recommendation. The parties must specifically identify the factual findings and legal conclusions in the Recommendation to which an objection is made.  Frivolous, conclusive, or general objections will not be considered by the court.

Failure to file written objections to the Magistrate Judge's findings and recommendations under the provisions of 28 U.S.C. § 636(b)(1) shall bar a *de novo* determination by the District Court of legal and factual issues covered in the

Recommendation and waives the right of the plaintiff to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

 DONE this 29th day of May, 2019.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE